**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **SUBRINA HARRIS, individually and as Administratrix of the Estate of JOSEPH HARRIS, JR. (deceased),** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. 5:11-CV-22(MTT)** |
| **SOUTHERN HEALTH PARTNERS, INC., *et al.*,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

## ORDER

This action arises from the death of an inmate while he was a patient in the medical unit at Houston County Detention Center ("HCDC").  Defendant Southern Health Partners, Inc. operates the unit pursuant to a contract with Houston County.  The remaining Defendants are nurses employed by Southern Health Partners to staff the medical unit.  The Defendants have moved for summary judgment (Docs. 54, 57) and the Plaintiff has moved for partial summary judgment (Docs. 59-67).  For the reasons discussed below, the Defendants' Motion (Doc. 54) is **DENIED in part** and **GRANTED in part**, the Defendants' Motion (Doc. 57) is **GRANTED**, and the Plaintiff's Motions (Docs. 59-67) are **DENIED**.

## I.   FACTUAL BACKGROUND[1]

On August 3, 2009, Joseph Harris, Jr., the decedent, was incarcerated at HCDC for a probation violation stemming from a traffic ticket.  (Doc. 1 at ¶ 25).  Prior to his incarceration, Harris had been briefly hospitalized at Vaughn Regional Medical Center in Selma, Alabama in November 2008 for dilated cardiomyopathy (an enlarged heart) and hypertension and was prescribed medications for his heart conditions.  (Doc. 68 at ¶¶ 19, 20).  On July 15, 2009, Harris went to the emergency room at Houston Medical Center complaining of weight loss, weakness, and pain in both legs.  (Doc. 70-16 at 6).  During this visit, the attending physician diagnosed Harris with diabetes.  (Doc. 68 at ¶ 24).  The following day, Harris saw Dr. Javed Fazal who renewed Harris's prescriptions for his heart medications and ordered a new prescription for Metformin to treat Harris's diabetes.  (Doc. 69-4 at 9:23-25; Doc. 70-6).  Harris filled the prescription for Metformin but did not fill his prescriptions for the heart medications.  (Doc. 82-37 at 6).

As part of the intake process at HCDC, an officer filled out a Receiving Screening Form (the "Intake Sheet") and recorded that Harris was presently taking medication for diabetes, high blood pressure, and an enlarged heart.  (Doc. 70-2 at 1).  Shortly after intake, Harris met with Defendant Lily Greene, LPN, the Medical Team Administrator at HCDC's medical unit.  Greene reviewed the Intake Sheet, made notations on it, and discussed Harris's medical history with him, including his enlarged heart, high blood pressure, and diabetes.  (Doc. 68 at ¶ 31).  Harris told Greene that his high blood pressure was under control as a result of weight loss and that he no longer wanted or needed his medications for his heart conditions.  (Doc. 55-3 at ¶ 11).  Harris, however,

---

[1] The Court views the facts, at least initially, in a light most favorable to the Plaintiff, even though the Plaintiff has also moved for summary judgment.

said that he needed his Metformin, and his wife, Plaintiff Subrina Harris, took that medication to HCDC the next day.  (Doc. 56 at ¶¶ 16-17).  Greene did not request Harris's medical records or further inquire into his medical history.

Greene informed Dr. Harry Brown, HCDC's contract physician, about Harris and his history.  Dr. Brown, who never saw Harris throughout his stay in the medical unit, entered an order to treat Harris for diabetes by checking his blood sugar levels, providing him with a diabetic diet, and administering his Metformin, but Dr. Brown did not enter orders to treat Harris's heart conditions.  (Doc. 55-3 at ¶ 14).  Even though she did not have physician orders to treat Harris for his high blood pressure and enlarged heart, Greene ordered the other nurses caring for Harris to check his blood pressure regularly in light of his reported history.  (Doc. 55-3 at ¶ 15).

On August 12, 2009, Defendant Essie Anderson, RN, took a history and conducted a physical of Harris.  (Doc. 68 at ¶ 39).  Anderson learned that Harris had been previously hospitalized at Vaughn Regional for high blood pressure and cardiac disease and that he had a prior history of heart problems, hypertension, and diabetes, and she put this information on the Admission Data Form.  (Doc. 68 at ¶ 39).  Harris also informed Anderson that he quit taking his medications for his heart conditions approximately two months before his incarceration due to weight loss and side effects.  (Docs. 56 at ¶ 32; 68 at ¶ 42).  Anderson checked Harris's vital signs, which appeared to be normal, and recorded his weight as 244 pounds.  (Doc. 56 at ¶¶ 34-35).

On August 21, 2009, Harris was taken to the medical unit with complaints of nausea, vomiting, chills, and feeling weak.  (Doc. 56 at ¶ 37).  The nurses charted nothing abnormal other than a mild fever.  Dr. Brown was notified, and Harris was

3

treated with Tylenol and an antibiotic and kept in the medical unit to monitor the fever. (Doc. 56 at ¶¶ 40-41).  Because Harris voiced no complaints over the next several days, Harris was sent back to the general population on August 24.  However, Harris was readmitted to the medical unit later that day when a deputy observed him vomiting, although his vital signs did not appear to be abnormal upon readmission.  (Docs. 55-1 at 12; 56 at ¶ 49).

Over the next 17 days that Harris remained in the medical unit, he voiced on and off complaints of nausea and vomiting and was inconsistently eating his meals.  The nurses[2] responded to his failure to eat by occasionally offering him clear liquids instead of solid food or providing him with a nutritional support drink.  (Doc. 56 at ¶¶ 57, 87). One urinalysis was performed on August 30, but the results indicated that Harris was not dehydrated.  (Doc. 56 at ¶ 75).  Greene discussed Harris's lack of eating on several occasions with Dr. Brown, but Dr. Brown did not believe it necessary to obtain a court order to force feed him because he was eating to some extent.  (Doc. 69-2 at 66:11-19). Instead, Dr. Brown ordered the nurses to encourage Harris to eat.

The nurses continued to check Harris's vital signs and blood sugar, although he occasionally refused to comply, but they never found the results to be abnormal or concerning.  The nurses also had trouble on occasion getting Harris to take his Metformin and to shower.  On one occasion, Harris was encouraged to shower and eventually got into the shower fully clothed but refused to turn the water on and stated

---

[2] As discussed below, the nurses had varying degrees of responsibility for Harris's care.  The remaining Defendant Nurses include: Valerie Brown, LPN, Sasha Dixson, LPN, Angela Jackson, LPN, Beth Kaplan, RN, Miranda Mertens, LPN, Debra Owen, LPN, Natasha Staten-Smith, LPN, and Tiffany Sumler, LPN. Defendant Angela Jackson has never been served in this case.

4

that he did not want to shower.  (Doc. 55-1 at 14).  The nurses also noted times when Harris was generally uncooperative.  (Doc. 55-1 at 14).

Harris occasionally used a wheelchair while in the medical unit, although it is unclear why.  Greene testified that it was more or less protocol for someone who was not eating properly, particularly being diabetic, because of concerns with weakness and blood sugar drops.  (Doc. 69-9 at 71:23-25; 72:1-5).  Mertens, however, testified that Harris wanted to go to visitation in a wheelchair so that his wife would think he was not feeling well and that he went to the recreation yard in a wheelchair because he did not want to walk.  (Doc. 69-10 at 37:3-6; 48:3-6).

According to the chart, the nurses weighed Harris twice after Anderson recorded his weight to be 244 pounds on August 12.  On September 1, Harris weighed 234 pounds, and he weighed 228 pounds on September 9.  (Doc. 55-1 at 13, 15).  Thus, according to the nurses' charting, Harris lost 16 pounds while in the medical unit.  However, the medical examiner found that Harris weighed 211 pounds when he died.  (Doc. 55-6 at 3).  Thus, there is evidence Harris lost 33 pounds while in the medical unit.

In sum, Harris's chart does not reveal any particular concerns among the nurses regarding his condition.  However, Staten-Smith, testified that she informed Greene that she thought Harris should be sent to the emergency room.  (Doc. 69-11 at 98:6-11).  The only firm date she provided for these discussions was September 6.  (Doc. 69-11 at 100:7-13).  Staten-Smith claims that she also informed Anderson and Jackson of her concerns regarding Harris.  (Doc. 69-11 at 99:13-19).  Both Greene and Anderson deny that these conversations ever took place.  (Docs. 55-3 at ¶ 4; 55-4 at ¶ 5).  But, Staten-

Smith insists that the need for Harris to go to the emergency room was "well discussed." (Doc. 69-11 at 99:5-12).  Staten-Smith further testified Greene told her on several occasions Harris could not be sent to the emergency room because Major Holt, HCDC's administrator, denied the requests due to staffing concerns.  (Doc. 69-11 at 101:16-25; 102:1-2).  Major Holt denies being asked permission by anyone to send Harris to the emergency room.  (Doc. 82-36 at ¶ 4).  Major Holt also asserts that the nursing staff only need inform him, and were not required to ask permission, for an inmate to be sent to the emergency room.  (Doc. 82-36 at ¶ 4).

On the morning of September 10, Harris's blood sugar was normal, and Staten-Smith charted that he was "awake and alert" and talking and laughing with the staff. (Doc. 56 at ¶¶ 130-131).  At 12:30 p.m., Harris was observed to be resting and without complaints, but he refused his meals, medication, and a check of his vital signs.  (Doc. 56 at ¶ 132).  Mertens encouraged him to get up and move around to regain some strength.  (Doc. 56 at ¶ 133).

At approximately 3:30 p.m., an officer found Harris unresponsive and notified the nursing staff.  (Doc. 56 at ¶ 135).  The nurses began administering CPR and called EMS, who arrived shortly thereafter and took Harris to the hospital.  (Doc. 56 at ¶¶ 136-137).  Harris was pronounced dead at 4:06 p.m.  (Doc. 56 at ¶ 137).

On September 12, an autopsy was performed by Dr. Douglas Posey.  (Doc. 56 at ¶ 138).  Dr. Posey determined that the cause of death was "cardiac dysrhythmia due to hypertensive cardiovascular disease."  (Doc. 55-6 at 6).  Dr. Posey further found that Harris suffered from cardiomegaly (i.e., an enlarged heart), with his heart weighing 640 grams.  (Doc. 69-16 at 25:2-4).  Dr. Posey identified Harris's enlarged heart and the

"hypertrophy of [Harris's] left ventricle myocardium" as two separate and independent risk factors for sudden cardiac death.  (Doc. 69-16 at 30:8-10, 17-18).  Dr. Posey opined that diabetes did not play a role in Harris's death.  (Doc. 69-16 at 65:20-24).

## II.  DISCUSSION

### A.  Motion for Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"'If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment.'"  *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (quoting *Four Parcels*, 941 F.2d at 1438).  The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case, on which it bears the burden of proof at trial, no reasonable jury could find for the non-

moving party." *Four Parcels*, 941 F.2d at 1438.  In other words, the moving party's evidence must be so credible, that if not controverted at trial, the party would be entitled to a directed verdict.  *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1992)).

### B.  Deliberate Indifference to a Serious Medical Need

The Plaintiff argues that each nurse was deliberately indifferent to Harris's serious medical needs and such deliberate indifference caused his death.  A medical services provider's "'deliberate indifference to [the] serious medical needs of [a] prisoner[ ] constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment.'"[3] *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

---

[3] Harris received treatment from the Defendant Nurses both before and after his sentencing.  As a pre-trial detainee, his rights existed under the Due Process Clause of the Fourteenth Amendment.  Post-

"[A] prisoner must shoulder three burdens" to bring a claim for deliberate indifference. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  First, the prisoner must satisfy an objective component by showing there was a serious medical need.  *Id.* (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)).  Second, he must satisfy the subjective component by showing that the prison official was deliberately indifferent to the serious medical need.  *Id.* (citing *Bozeman*, 422 F.3d at 1272).  The prisoner must prove three elements to satisfy the subjective prong of the deliberate indifference test: "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'"  *Bozeman*, 422 F.3d at 1272 (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)).  "Third, as with any tort claim, [he] must show that the injury was caused by the defendant's wrongful conduct."  *Goebert*, 510 F.3d at 1326 (citing *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995)).  Ultimately, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, and poor exercise of medical judgment."  *Simpson v. Holder*, 200 Fed. Appx. 836, 839 (11th Cir. 2006) (citing *Estelle*, 429 U.S. at 104-07).[4]

### 1.  Objective Inquiry – Serious Medical Need

In the Eleventh Circuit, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

---

sentencing, Harris's rights fell under the Eighth Amendment's prohibition on cruel and unusual punishment.  Regardless of what amendment governed Harris's constitutional rights, the test for deliberate indifference remains the same.  *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (explaining the deliberate indifference claims of a pre-trial detainee are subject to the "same scrutiny" as claims falling under the Eighth Amendment).

[4] The Defendants concede that they are not entitled to the defense of qualified immunity.  (Doc. 47 at 1).

would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243

(quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994)).  In

either situation, the medical need must be "one that, if left unattended, 'pos[es] a

substantial risk of serious harm.'" *Id.* (internal citations omitted).

For purposes of their Motion, the Defendants do not contend "that a serious

medical condition did not exist."  (Doc. 55 at 14).  In her Motions for Partial Summary

Judgment, the Plaintiff contends that Harris "suffered from an enlarged heart,

hypertension, cardiac disease, depression, stopped eating causing significant weight

loss, over 17 consecutive days housed in the Medical Unit, and severe weakness (or

frailty), causing him to be placed in a wheelchair, and diabetes, which, individually

and/or collectively amounted to a 'serious medical need.'"  (Doc. 59 at 2).  For purposes

of the Defendants' Motion, the Court will assume that Harris's conditions are serious

medical needs.

## 2.  Subjective Inquiry – Deliberate Indifference

To satisfy the first element of the subjective prong of the deliberate indifference

test requires the Plaintiff to show that the Defendant Nurses had subjective knowledge

of a risk of serious harm.  Subjective knowledge requires that a defendant was "'both [ ]

aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and [ ] must also [have] draw[n] the inference.'" *Burnette v. Taylor*, 533

F.3d 1325, 1330 (11th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837

(1994)).  A defendant cannot be held liable for a constitutional violation for failing to

alleviate a significant risk that he should have perceived but did not.  *Id.* at 1331 (citing

*Farmer*, 511 U.S. at 837).

A plaintiff may not demonstrate subjective knowledge of the risk by "imputed or collective knowledge."  *Id*.  Rather, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows."  *Id*.  However, a factfinder may infer from circumstantial evidence or from "the very fact that the risk was obvious" that the defendant had subjective knowledge.  *Goebert*, 510 F.3d at 1327 (quoting *Farmer*, 511 U.S. at 842).

The Plaintiff, somewhat confusingly, takes different approaches in her efforts to establish subjective knowledge of a risk of serious harm on the part of all the Defendant Nurses.  In her brief in support of her Motions for Partial Summary Judgment, she makes the straightforward argument that the nurses were subjectively aware of the serious risk posed by Harris's deteriorating condition.  (Doc. 72 at 22-27).  In her Response to the Defendant Nurses' Motion for Summary Judgment, the Plaintiff argues that the Defendant Nurses had subjective knowledge of two additional risks of serious harm.  She first argues that the Defendant Nurses "had subjective knowledge of the risk of not ordering Harris's medical records."  (Doc. 81-1 at 7).  As a part of this argument, the Plaintiff contends that the nurses were subjectively aware of the danger of relying on Harris to provide an accurate medical history and were subjectively aware of the risk of not getting information from the Plaintiff about her husband's medical history.  (Doc. 81-1 at 7).  In short, the Plaintiff argues that all the nurses knew that they did not have Harris's prior medical records and the failure to get these records, standing alone, is a risk of serious harm.

Second, the Plaintiff argues that the nurses knew or should have known about Harris's cardiac history from the information contained in the Intake Sheet and the Data

Assessment Form.  The Plaintiff argues that knowledge of her husband's cardiac conditions is by itself sufficient knowledge of a risk of serious medical harm to preclude summary judgment.

It is not clear why the Plaintiff characterizes the failure to get Harris's prior medical records and the limited information about Harris's cardiac conditions in the Intake Sheet and the Data Assessment Form as separate risks of serious medical harm. It appears that the Plaintiff is really arguing that the nurses should have gotten Harris's medical records and should have been aware of the information in the Intake Sheet and the Data Assessment Form, and thus, the Court should deem the nurses to have knowledge of the information contained in those records.  If so, her argument is without merit; the nurses cannot be judged on what they should have known.

The true issue is whether, as a result of Harris's allegedly deteriorating condition, any of the nurses had subjective knowledge of a risk of serious medical harm.  The answer is that some did and that some did not.

Given that the events in this case unfolded over an extended period of time and involved over a dozen people, most of whom have been deposed, five experts, all of whom have been deposed, and hundreds of pages of records, it is not surprising that the Parties spend considerable time shuffling the factual minutia to fit their respective views.  But in the end, the question of whether the Plaintiff has adduced sufficient evidence to allow her various claims to go to a jury is fairly easily answered.  Although the information in Harris's chart, by itself, does not sufficiently establish that the nurses had subjective knowledge of a risk of serious harm, other evidence does.  Most significantly, there is evidence that by September 6 at least one nurse, Staten-Smith,

had concluded that Harris needed emergency medical treatment because of his deteriorating condition.  According to her, she communicated this information to other nurses, and Mr. Harris's condition was "well discussed."  While these other nurses deny these conversations took place, that dispute is for a jury to decide.  Also, if the medical examiner is to be believed, there is evidence that Harris lost 33 pounds while in the medical unit.  Even for a person of Harris's size, such a dramatic weight loss is consistent with Staten-Smith's view that Harris needed emergency medical treatment.

In short, the Plaintiff has adduced sufficient evidence to allow a jury to conclude that at least by September 6, the nurses treating Harris had subjective knowledge of a risk of serious harm.  The nurses who treated or had significant contact with Harris on or after September 6 were Sasha Dixson, Miranda Mertens,[5] Debra Owen, and Natasha Staten-Smith.  Although Lily Greene and Essie Anderson did not chart after September 6, they were, according to Staten-Smith, aware of Harris's need for medical treatment and thus the Plaintiff has adduced sufficient evidence that they too had knowledge of a risk of serious harm.  Valerie Brown last saw Harris on September 4, and the Court concludes that the Plaintiff has not sufficiently demonstrated that she had subjective knowledge of a risk of serious harm.  Although Beth Kaplan, the part-time mental health nurse, had a brief contact with Harris on September 7, she had no responsibilities for his treatment and had no knowledge of his medical issues, particularly his cardiac conditions.  Thus, Kaplan is entitled to summary judgment.  Sumler's only involvement with Harris's care or treatment was to perform some of his blood sugar checks, and she

---

[5] Mertens testified that she and Greene discussed the possibility of Harris needing emergency care if he continued to refuse to eat.  (Doc. 69-10 at 17:11-18).

never charted in the nurses' notes.[6]  Thus, Sumler is entitled to summary judgment as well.

The conclusion that there is sufficient evidence that the remaining nurses had knowledge of a serious medical risk almost necessarily answers the questions of whether the Plaintiff has sufficiently shown a disregard of that risk by conduct that is more than grossly negligent.  There is evidence that those nurses either did nothing in response to Harris's need for emergency medical treatment or failed to call for emergency assistance after Holt told them that he could not spare guards to assist in getting Harris the treatment that he needed.  Those facts, if believed by a jury, would support a finding that the remaining nurses disregarded Harris's need for medical treatment by conduct that was more than grossly negligent.

Accordingly, the Defendants' Motion for Summary Judgment with regard to Nurses Anderson, Greene, Dixson, Mertens, Owen, and Staten-Smith is **DENIED**.[7]

### C.  Greene's Role as Supervisor

The Plaintiff asserts in her briefs that Greene's acts as a supervisor can be used to impute liability to SHP.  This is not quite correct.  Rather, supervisor liability could be an additional basis for holding Greene individually liable.

To impose supervisor liability on a defendant for a constitutional violation, a plaintiff must show "that the defendant instituted a 'custom or policy [that] result[s] in

---

[6] Sumler was also one of the nurses who administered CPR to Harris when he was found unresponsive. The Plaintiff does not contend this has any impact on her liability.

[7] The Defendants have not moved for summary judgment on the grounds that the Plaintiff cannot establish that the Defendants' conduct was a cause of Harris's death.  The Court notes, however, that the Plaintiff's expert, Dr. Bruse Charash, has testified that the nurses' intervention or earlier response more likely than not would have prevented Harris's death.  (Doc. 88 at 35, 47-50, 52-53).

deliberate indifference to constitutional rights or ... directed [his] subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Goebert*, 510 F.3d at 1331. A supervising individual may also be held liable for inadequate training or supervision of staff. *See Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (internal citation omitted) ("We apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs; (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation.").

The Plaintiff argues that Greene's "deficiencies as a supervisor" are premised on problems with "charting, filing, [and the] failure to correct." (Doc. 72 at 34). The Plaintiff does not elaborate on what Greene failed to correct. The Plaintiff also does not explain how these "deficiencies" constitute deliberate indifference, whether a reasonable person in Greene's position would understand her actions were deliberately indifferent, or the causal connection between the "deficiencies" and the alleged constitutional violation.

Accordingly, to the extent the Plaintiff has raised a claim against Greene based on her supervisory role, Greene is entitled to summary judgment on that claim. To the extent the Plaintiff truly intended to argue that Greene's acts as supervisor could be used to impute liability to SHP, SHP is entitled to summary judgment on that claim.

### D.  Liability of SHP

The Plaintiff also seeks to hold SHP accountable for Harris's death under several theories of municipal liability.  "'[W]hen a private entity ... contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state' and 'becomes the functional equivalent of the municipality' under [S]ection 1983."  *Craig*, 643 F.3d at 1310 (quoting *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)).  Therefore, liability under Section 1983 may not be premised on the doctrine of respondeat superior but, instead, must rest on the doctrine of municipal liability.  *Id.*

As a preliminary matter, SHP argues that the only claim asserted against SHP in the Complaint is based on respondeat superior liability, and the Plaintiff never amended her Complaint to allege claims for municipal liability.  The Plaintiff contends that even if the Complaint did not assert claims for municipal liability against SHP, her interrogatory responses made her claims clear, and, in the event that the interrogatory responses cannot be used to flesh out her claims, she would like leave to amend her Complaint to properly add her claims.[8]

Even assuming the Plaintiff can use interrogatory responses to supplement pleading deficiencies, at most, the Plaintiff's interrogatory responses raise claims regarding SHP's policies or customs and a failure to train or supervise.  In her brief in support of her Motion for Summary Judgment, the Plaintiff also advances another theory not pled in her Complaint – Greene is a final policymaker for SHP.  Under this theory, municipal liability may be imposed for a single decision made by a final

---

[8] The Plaintiff's request for leave to amend her Complaint is **DENIED**.  The Parties had until October 25, 2012, to file any motions to amend pleadings.

policymaker.  *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)).  Two important principles guide the determination of who qualifies as a final policymaker.  "First, 'the authority to make municipal policy is necessarily the authority to make *final* policy.'"  *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996) (emphasis in original) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  "Second, the alleged policymaker must have final policymaking authority with respect to the action alleged to have caused the particular constitutional or statutory violation."  *Id.* (internal citations omitted).  A medical staff member may be a final policymaker when his or her medical decisions are "subject to no supervision or review."  *Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989).  In no way do the Plaintiff's interrogatory responses suggest the Plaintiff was asserting a claim of this nature.  Accordingly, the Court will not consider the Plaintiff's final policymaker argument against Greene.  Regarding the remaining two claims against SHP, they fail regardless of whether they were properly asserted.

### 1.  Policy or Custom

There are three requirements for imposing Section 1983 liability on a private entity acting as a municipality for its policies or customs.  "[A] plaintiff must show: (1) that his constitutional rights were violated; (2) that the [entity] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  To establish the second element, a plaintiff must show either that the policy is facially unconstitutional or that a series of constitutional violations have occurred from which deliberate indifference can be inferred.  *Craig*, 643 F.3d at 1311.

The Plaintiff has identified three policy handbooks created by SHP for use by its nursing staff: Site Health Services Orientation Manual, Correctional Nursing: Patient Assessment and Treatment Guidelines, and Policy and Procedure Manual for Health Services in Jails.  The Plaintiff argues the policies in existence were inadequate and other nonexistent policies could have been implemented that would have saved Harris's life.  The Plaintiff has not clearly articulated which policies are inadequate.  However, the Plaintiff makes passing references to the following "policies" found within the handbooks: the Orientation Manual's requirement that nurses chart all patient encounters using a particular format, the requirement for nurses to use "Clinical Pathway" forms, the requirement to obtain medical records, a policy requiring nurses to review a patient's entire chart prior to treatment, a policy to proscribe individual treatment plans for "special needs" patients, the informed consent policy, and a "Hunger Strike" protocol.[9]  The Plaintiff argues that the nurses failed to follow each of these policies in Harris's case.  Ultimately, the Plaintiff does not argue that these policies are facially unconstitutional or that they were unconstitutional as applied to Harris.  Rather, she argues SHP has a general custom of failing to enforce its policies and allowing its nurses instead to use their discretion in applying the policies and this amounts to deliberate indifference.[10]  The Plaintiff also contends that SHP's policy of staffing

---

[9] The Defendants dispute whether these "policies" were mandatory or just suggested guidelines and whether they even applied to Harris.  Because the Plaintiff has failed to demonstrate notice for the reasons discussed below, however, the Court does not need to reach that issue.

[10] "[A] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  *Goebert,* 510 F.3d at 1332 (quoting *Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997)).  "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."  *Id.* (citing *Praprotnik,* 485 U.S. at 127).

HCDC's medical unit primarily with LPNs requires them to make decisions above their level of training and education and caused Harris to receive constitutionally inadequate care.

Regardless of whether the Plaintiff's claim is based on SHP's policies or a custom of ignoring its policies, the Plaintiff must show SHP "had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert*, 510 F.3d at 1332. First, the Plaintiff argues showing a pattern of violations is unnecessary and irrelevant because she relies on an "'obviousness' analysis" rather than a "widespread" violations analysis. (Doc. 80-1 at 7). The Plaintiff contends that the need for better policies should have been obvious to SHP because "there are some peculiarities to inmate medical care." (Doc. 80-1 at 7). The Plaintiff, however, may not use an "obviousness analysis" to establish notice of a deliberately indifferent policy or custom. The "obviousness analysis" that the Plaintiff references is a way to get around the notice requirement in a claim for deliberate indifference premised on inadequate training or supervision.[11] *See, e.g.*, *Gold v. City of Miami*, 151 F.3d 1346, 1352 (11th Cir. 1998).

Second, the Plaintiff argues that even if notice is required, SHP cannot claim ignorance because 67 grievances regarding the medical unit were filed by 24 inmates in a nine-month span preceding Harris's death. The Plaintiff contends that these grievances show the medical unit was experiencing problems with distributing medications and scheduling visits with Dr. Brown.

---

[11] The Plaintiff intertwines the analysis for a deliberate indifference claim based on a policy or custom and a claim based on inadequate training or supervision throughout her pleadings. However, the Court assumes that the Plaintiff meant to assert them as separate grounds for imposing liability on SHP, and thus, the Court treats them separately.

Grievances, even if they arise from valid complaints, are not necessarily constitutional violations.  Although the grievances here certainly relate to the complainants' perceived quality of the healthcare services offered by SHP's nurses, they do not relate to the alleged constitutional deprivations suffered by Harris. Moreover, the Plaintiff does not demonstrate how these grievances, pertaining to access to medication and Dr. Brown, relate to SHP's alleged custom of disregarding the policies identified above.

Finally, the Plaintiff asserts that SHP had notice that its policies were deficient based on the decision rendered in *Swann v. Southern Health Partners, Inc.*, 388 F.3d 834 (11th Cir. 2004).[12]  There, the Eleventh Circuit remanded the case because it determined that the district court erred in using a heightened pleading standard to evaluate the plaintiff's amended complaint.  *Id.* at 836-38.  The Eleventh Circuit never reached the merits of the case in that decision.

Without sufficient evidence to show SHP was aware of a "widespread" practice of constitutional violations caused by its policies and customs, the Court has no need to determine whether the identified policies or SHP's alleged custom of disregarding its policies amounts to deliberate indifference or whether it caused a violation of Harris's constitutional rights.

---

[12] The Plaintiff cites this portion of the case: "While incarcerated, the decedent repeatedly reported to SHP's employees at the detention center that she had not urinated in several days, but was not given a urine test until January 7, 2001.  SHP staff received the results of decedent's test on January 8, 2001, acknowledging that she had an infection, but decedent was still not treated.  On January 9, decedent became disoriented and was released on a recognizance bond and sent to the emergency room at the Blount County Medical Center.  The decedent was transferred to Medical Center East in Birmingham, Alabama, where she went into a coma and died on January 25, 2001, due to acute renal failure."  *Swann*, 388 F.3d at 835.  "Having once caused an unnecessary death," the Plaintiff asserts, "one would think SHP would have adopted better practices to assure that inmates like Harris would have received proper medical care."  (Doc. 72 at 39).  However, the quoted text from the *Swann* decision was merely the Eleventh Circuit's recitation of the facts as alleged in the amended complaint and in no way was an indication of SHP's liability.

### 2.   Failure to Train or Supervise

"[T]here are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under [Section] 1983." *Gold*, 151 F.3d at 1350 (quoting *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).  To qualify as a limited circumstance, the following requirements must be met: (1) the private entity inadequately trains or supervises its employees; (2) this failure to train or supervise is the entity's policy; and (3) the entity policy causes the employees to violate an inmate's constitutional rights.  *See id.* (citing *City of Canton*, 489 U.S. at 389-91).  Because an entity "rarely will have an express written or oral policy of inadequately training or supervising its employees," a plaintiff may establish the existence of a policy "by showing that the [entity's] failure to train evidenced a 'deliberate indifference' to the rights of" the inmates.  *Id.* (citing *City of Canton*, 489 U.S. at 388-89).  To establish "deliberate indifference" in this context, the "plaintiff must present some evidence that the [entity] knew of a need to train and/or supervise in a particular area and the [entity] made a deliberate choice not to take any action."  *Id.* (internal citations omitted).  A plaintiff may either demonstrate notice of a need to train or supervise by showing a "widespread pattern of prior abuse" or "a single earlier constitutional violation" or by showing that the need for training was so obvious that the failure to train would result in a constitutional violation.  *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1189 (11th Cir. 2011) (internal citations omitted).

The Plaintiff contends that SHP failed to provide its "nurses with appropriate training and supervision on how to provide constitutionally mandated medical care in a

jail setting."[13]  (Doc. 80-1 at 6).  The Plaintiff argues SHP offered "zero training" to its nurses and instead provided manuals for the nurses to read in their downtime at work. (Doc. 72 at 37).  The Plaintiff also contends that SHP's policy of allowing the nurses to use their own judgment in place of SHP's actual guidelines and policies amounted to inadequate training.  Finally, the Plaintiff asserts that the nurses were essentially under no medical supervision because Greene was not adequately supervising her staff and because Dr. Brown had such limited interaction with inmates.

The Defendant responds that all of its nurses are educated, licensed, and experienced.  The Defendant also points out that any of the Plaintiff's arguments regarding Dr. Brown's deliberate indifference are irrelevant because Dr. Brown was not an employee of SHP.

To the extent the Plaintiff intends to establish notice of prior abuse through the grievances regarding the medical unit, this argument is without merit for the reasons discussed above.[14]  The Plaintiff also attempts to establish SHP's notice of training inadequacies and a need for corrective measures through its knowledge of "the filing

---

[13] The Plaintiff premises her argument regarding inadequate training and supervision on the incorrect legal standard.  Rather than citing a test for municipal liability, the Plaintiff cites the test to impose liability on a supervising individual for his failure to adequately train or supervise staff.  *See Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (internal citation omitted) ("We apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs; (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation.").

[14] *See supra* section D.1.

mess" at the medical unit, Greene's failure to timely complete administrative paperwork, and Dr. Brown's limited interaction with patients.[15]

Although messy files and untimely reports may be an indication that the medical unit could have used help with organization, the Plaintiff does not explain how these issues constitute the kind of notice of "widespread abuse" contemplated for municipal liability under Section 1983.  The Court cannot treat Dr. Brown's limited interaction with patients as sufficient notice either.  First, Dr. Brown was not an SHP employee. Furthermore, Dr. Brown was hired as a part-time physician only and would reasonably be expected to have less interaction with inmates than SHP's primarily full-time nurses. Although SHP had notice that Dr. Brown's visitations were lower in June through August of 2009 and presumably could have inquired into the reason for the decrease, the Plaintiff has not provided any evidence of the reasons for the decreased visitations or why they were an indication that should have tipped SHP off to "widespread abuse."

Because the Plaintiff has not presented sufficient evidence of widespread abuse or at least one prior constitutional violation, the Plaintiff must demonstrate that the need for training was so obvious that the failure to train would result in a constitutional violation.  It is unclear why the Plaintiff believes the need for additional or different training was obvious here.  The Plaintiff at one point alludes to the "nature of the

---

[15] Laura Busbin, a former regional administrator at SHP, testified that there were problems with filing at the medical unit prior to and after Harris's death.  (Doc. 69-8 at 39:16-25; 41:1-9).  Greene admitted that she did not have regular administrative meetings or fill out the form provided by SHP for the meeting but explained that she had trouble getting all participants together and would speak with the jail administrator on an as-needed basis instead.  (Doc. 69-9 at 135-136).  Regarding Dr. Brown, the Plaintiff points to a Monthly Health Services Report documenting the number of on-site physician visits for 2009.  (Doc. 70-25).  The report shows that Dr. Brown had fewer visits with patients in the few months preceding Harris's deaths than in other months in 2009, with no visits at all in July 2009.  Hairsine testified that the numbers were reported on a monthly basis so that the numbers from August 2009 would have been available to SHP prior to Harris's death in September.  (Doc. 69-7 at 92:18-19; 93:5-9).

business," noting that "providing care to inmates is certainly different and requires training beyond just what is obtained in obtaining a nursing degree." (Doc. 72 at 35). The Plaintiff later states that there was an "obvious need for enforced policies and guidelines," presumably referencing SHP's acquiescence to the nurses using their own judgment in place of the prescribed policies and guidelines. (Doc. 72 at 37).

Neither of these rationales supports the conclusion that an obvious need for training existed to prevent likely constitutional violations. The Plaintiff provides no support for her bald assertion that correctional healthcare requires different training than any other healthcare facility,[16] nor does the Plaintiff identify what training the nurses should have received to prepare them for work in a jail. Further, the Plaintiff does not assert that any of SHP's nurses had inadequate education or experience so that the need for additional training, beyond the provided manuals, should have been obvious to SHP.

Because the Plaintiff has not shown that the need for different training in a correctional setting was so obvious to put SHP on notice that a constitutional violation would occur, nor does the Plaintiff even identify what that training should consist of, the Plaintiff has not established the elements of this claim either.

Accordingly, SHP is entitled to summary judgment on both claims against it.

### E.  The Plaintiff's Motions for Partial Summary Judgment

The Plaintiff has moved for partial summary judgment with regard to each of the nurses.  Essentially, the Plaintiff contends that she is entitled to summary judgment on the issue of whether each nurse was deliberately indifferent to Harris's serious medical

---

[16] Cindy Kovacs-Whaley, the Defendants' expert, testified that the standard for medical treatment is the same regardless of whether a patient is incarcerated.  (Doc. 91 at 38:13-16).

needs.  Because the Court has granted Jackson, Brown, Kaplan, and Sumler's Motions for Summary Judgment, the Plaintiff's Motions as to them are **MOOT**.  With regard to the remaining nurses, detailed discussion of the Plaintiff's Motions is not necessary. Other than Staten-Smith, the facts regarding their subjective knowledge of a serious medical need are disputed.  Although Staten-Smith admits that she was aware of Harris's serious medical needs, she has adduced facts which, if believed, could allow a jury to conclude that she did not disregard that serious medical need.

Accordingly, the Plaintiff's remaining Motions for Partial Summary Judgment are **DENIED.**

### III. CONCLUSION

For the foregoing reasons, the Defendant Nurses' Motion for Summary Judgment (Doc. 54) is **DENIED** as to Lily Greene, Essie Anderson, Sasha Dixson, Miranda Mertens, Debra Owen, and Natasha Staten-Smith and **GRANTED** as to Angela Jackson, Valerie Brown, Beth Kaplan, and Tiffany Sumler.  Defendant SHP's Motion for Summary Judgment (Doc. 57) is **GRANTED**.  The Plaintiff's Motions for Partial Summary Judgment (Docs. 59-67) are **DENIED**.  Defendants Angela Jackson, Valerie Brown, Beth Kaplan, and Tiffany Sumler are **DISMISSED as parties to this action**. Further, the Court **GRANTS** the Defendants' Motion to certify any dismissal as a final order, and pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court directs the Clerk to enter final judgment in favor of Defendants Jackson, Brown, Kaplan, and Sumler, finding that there is no just reason for delaying the entry of final judgment in favor of these Defendants.

**SO ORDERED**, this the 30th day of May, 2013.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT